ORAL ARGUMENT NOT YET SCHEDULED

_____

No. 15-7094

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MICHAEL QUEEN,                          )
                                        )
Appellant/Plaintiff,                    )
                                        **)**
        v.                              )
                                        **)**
ED SCHULTZ,                             )
                                        **)**
Appellee/Defendant.                     )
_____ )

_____

Appeal from the United States District Court
for the District of Columbia
Civil Action No. 11-871 (BAH)

_____

**CORRECTED INITIAL BRIEF
OF APPELLANT MICHAEL QUEEN**

_____

Frazer Walton, Jr.                Steven W. Teppler
1913 D. Street N.E.               F. Catfish Abbott
Washington, D.C. 20002            Madison L. Kvamme
(202) 398-8920                    ABBOTT LAW GROUP, P.A.
                                  2929 Plummer Cove Road
                                  Jacksonville, Florida 32223
                                  (904) 292-1111
                                  *Counsel for Plaintiff-Appellant*

## PARTIES, RULINGS, AND RELATED CASES

Appellant Michael Queen, by and through counsel, certifies as follows:

**A.    Parties:** Michael Queen (Plaintiff/Appellant) and Ed Schultz (Defendant/Appellee). There are no intervenors or *amici*.

**B.    Rulings Under Review.** The following rulings in *Queen v. Schultz*, No. 11-0871 (BAH), are at issue in this Court:

- May 18, 2015 Judgment on the Verdict (ECF No. 180); and

- August 5, 2015 Memorandum Opinion (ECF No. 203).

**C.    Related Cases.** This case was before this Court in case number 12-7099. Undersigned counsel is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

Table of Cases, Statutes, and Authorities ................................................ v

Jurisdictional Statement............................................................................ 1

Statement of the Issues............................................................................. 2

Statement of the Case .............................................................................. 4

Summary of Argument ............................................................................ 22

Argument ................................................................................................ 26

    I.    THE DISTRICT COURT REVERSIBLY ERRED IN FAILING TO ADMIT THE COMPOSITE OF EMAILS AS BUSINESS RECORDS. ....................................................... 26

    II.    THE DISTRICT COURT REVERSIBLY ERRED IN PROVIDING A LIMITING INSTRUCTION THAT HYBRIDIZED "NOT HEARSAY" AND THE STATE OF MIND EXCEPTION...................................... ...................33

    III.    THE DISTRICT COURT REVERSIBLY ERRED IN ENCOURAGING AND PERMITTING SCHULTZ TO REFERENCE INDENTURED SERVITUDE IN CLOSING ARGUMENT BECAUSE IT WAS A PREJUDICIAL ARGUMENT BEFORE A PREDOMINATELY AFRICAN-AMERICAN JURY, A MISREPRESENTATION OF THE LAW AND THE FACTS, AND WAS NOT PLEAD AS A DEFENSE.................................................................36

    IV.    THE DISTRICT COURT REVERSIBLY ERRED IN PERMITTING SCHULTZ TO REFER TO THE PRETRIAL DISMISSAL OF THE CONTRACT AND AGENCY COUNTS IN OPENING STATEMENTS BECAUSE OF THE PREJUDICIAL INFLUENCE OF THE JUDICIAL IMPRIMATUR.............................................................42

iii

V.     THE DISTRICT COURT REVERSIBLY ERRED IN DENYING QUEEN'S PRETRIAL MOTION FOR SPOLIATION BECAUSE IT FAILED TO CONSIDER ALL OF SCHULTZ'S TRIGGER DATES AFTER IT FOUND ONE OF THE PROPOSED DATES "LAUGHABLE" AND FURTHER FAILED TO ADDRESS WHETHER SCHULTZ'S COUNSEL LANDA ALSO HAD A DUTY TO PRESERVE SCHULTZ'S EMAILS...................................................44

VI.    THE DISTRICT COURT REVERSIBLY ERRED THROUGH ITS CONTINUING AND CUMULATIVE DEMONSTRATIONS OF BIAS BECAUSE IT CAUSED SERIOUS AND UNFAIR PREJUDICE AND DEPRIVED QUEEN OF HIS DUE PROCESS RIGHTS......................49

Conclusion  ...........................................................................66

Certificate of Compliance.................................................................67

Certificate of Service.....................................................................68

iv

# TABLE OF AUTHORITIES

## A. Cases

*_Arizona v. Washington_, 434 U.S. 497  (1978)...........................42, 44

_Beck v. Test Masters Educ. Servs._, 289 F.R.D. 374 (D.D.C. 2013).........48

_Bird v. Glacier Elec. Coop., Inc._, 255 F.3d 1136 (9th Cir. 2001)..........38

_Bixler v. Foster_, 596 F.3d 751 (10th Cir. 2010)................................49

_Calicchio v. Sachem Cent. Sch. Dist._, No. 14-CV-5958 (DRH) (SIL), 2015 U.S. Dist. LEXIS 139001 (E.D.N.Y. Oct. 13, 2015)..........................40

_Clarke v. Wash. Metro. Area Transit Auth._, 904 F. Supp. 2d 11 (D.D.C. 2012)...................................................................................45

_Crawford v. Louisiana_, No. 14-1190, 2015 U.S. Dist. LEXIS 23544 (E.D. La. Feb. 26, 2015)................................................................41 n.7

_Czekalski v. Lahood_, 589 F.3d 449 (2009).....................................49

_Herrick v. Garvey_, 298 F.3d 1184 (10th Cir. 2002)..........................44

_In re Lorazepam & Clorazepate Antitrust Litigation_, 467 F.Supp. 2d 74 (D.C. Cir. 2006)......................................................................38

_It's My Party, Inc. v. Live Nation, Inc._, 2012 U.S. Dist. LEXIS 119625 (D. Md. Aug. 23, 2012)................................................................27

_Jones v. Tyson Foods, Inc._, 971 F. Supp. 2d 648 (N.D. Miss. 2013)...............................................................................41 n.7

_Kaveney v. Miller_, 1993 U.S. Dist. LEXIS 10784 (E.D. Pa. July 30, 1993)..................................................................................41

_Keogh v. Commissioner of Internal Revenue_, 713 F.2d 496 (9th Cir. 1983)..................................................................................29

*_Landmark Legal Found. v. EPA_, 82 F. Supp. 3d 211 (D.D.C. 2015)....41

_Liteky v. United States_, 510 U.S. 540 (1994)..................................49

_Nat'l Conf. of Pers. Managers, Inc. v. Brown_, No. CV 12-09620 DDP (RZx), 2015 U.S. Dist. LEXIS 106830 (C.D. Cal. Aug. 13, 2015).....41 n.7

_Neder v. United States_, 527 U.S. 1 (1999)......................................38

_Pacheco v. Universal Ins. Grp., Inc._, No. 13-1459 (JAG), 2015 U.S. Dist. LEXIS 177311 (D.P.R. Feb. 9, 2015)..............................................31

_Parsi v. Daioleslam_, 778 F.3d 116 (D.C. Cir. 2015).........................44

_Payne v. Stansberry_, 760 F.3d 10 (D.C. Cir. 2014).....................36, 38

_Phoenix Assocs. III v. Stone_, 60 F.3d 95 (2d Cir. 1995)...............................................................................29, 31

_Queen v. Schultz_, 888 F. Supp. 2d 145 (D.D.C. 2012).......................4

_Queen v. Schultz_, 747 F.3d 879 (2014)..........................................5

*Rafferty v. NYNEX Corp.*, 60 F.3d 844 (1995)………………………………49

*Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469 (D.C. Cir. 1995)…………..45

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013)………………27–28

*United States v. Dickerson*, 163 F.3d 639 (D.C. Cir. 1999)……………33

*United States v. Dinitz*, 424 U.S. 600 (1976)…………………………………42

\*United States v. Donato*, 99 F.3d 426 (D.C. Cir. 1996)……………63–65

*United States v. Dupree*, 2015 U.S. App. LEXIS 13027 (2d Cir. N.Y. July 28, 2015)……………………………………………………………………29, 31

*United States v. Edmond*, 52 F.3d 1080 (1995)………………………48, 59

*United States v. Fahnbulleh*, 752 F.3d 470 (D.C. Cir. 2014)……………………………………………………………………26, 29

*United States v. Ferber*, 966 F. Supp. 90 (D. Mass. 1997)………………29

*United States. v. Kozminski*, 487 U.S. 931 (1988)………………………40

*United States v. McGill*, Nos. 06-3190, 06-3193, 07-3001, 07-3003, 07-3065, 07-3124, 2016 U.S. App. LEXIS 3734 (D.C. Cir. Mar. 1, 2016)….33

\*United States v. Parnell*, 2015 U.S. Dist. LEXIS 68778 (M.D. Ga. May 28, 2015)…………………………………………………………………………28

*United States v. Reed*, 522 F.3d 354 (D.C. Cir. 2008)………………..36–37

\*United States v. Shackney*, 333 F.2d 475 (2d Cir. 1964)…………..40, 41

\*United States v. Smith*, 804 F.3d 724 (5th Cir. 2015)…………………32

*United States v. Spears*, 558 F.2d 1296 (7th Cir. 1977)…………………61

*United States v. Venable*, 269 F.3d 1086 (D.C. Cir. 2001)………………37

*United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997)…………..33

*United States v. Williams-Davis*, 90 F.3d 490 (1996)…………………..42

*United States v. Wilson*, 240 F.3d 39 (D.C. Cir. 2001)…………………38

*Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448 (Tenn. Ct. App. 2009)……………………………………………………………………………40

\*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011)…..47

## B. Constitutional Provisions

U.S. Const. amend. XIII……………………………………………………………37

## C. Rules

Federal Rule of Evidence 801…………………………………………………35

Federal Rule of Evidence 803……………………………26, 28–29, 31

\*     Authorities   upon   which   Appellant   primarily   relies.

# JURISDICTIONAL STATEMENT

This is an appeal from the District Court's May 18, 2015 Judgment and the August 5, 2015 Order denying Appellant's motion for new trial, recusal, and attorneys' fees. The District Court had subject matter jurisdiction of this action based upon diversity of citizenship pursuant to 28 U.S.C. §1332. Appellant filed a timely notice of appeal on September 1, 2015. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF ISSUES</u>

I.  The District Court reversibly erred in failing to admit the composite of emails as business records.

II.  The District Court reversibly erred in providing a limiting instruction that hybridized "not hearsay" and the state of mind hearsay exception.

III.  The District Court reversibly erred in encouraging and permitting Schultz to reference indentured servitude in closing argument because it was a prejudicial argument before a predominately African-American jury, a misrepresentation of the law and the facts, and was not plead as a defense.

IV.  The District Court reversibly erred in permitting Schultz to refer to the pretrial dismissal of the contract and agency counts in opening statements because of the prejudicial influence of the judicial imprimatur.

V.  The District Court reversibly erred in denying Queen's pretrial motion for spoliation because it failed to consider all of Schultz's trigger dates after it found one of the proposed dates "laughable"

and further failed to address whether Schultz's counsel Landa also had a duty to preserve Schultz's emails.

VI.  The District Court reversibly erred through its continuing and cumulative demonstrations of bias because it caused serious and unfair prejudice and deprived Queen of his due process rights.

## STATEMENT OF THE CASE

## I.     PROCEDURAL BACKGROUND

On May 10, 2011, Appellant Michael Queen filed a complaint against Appellee Ed Schultz stating five causes of action: breach of contract, breach of implied-in-fact contract, fraud in the inducement, tortious interference with a business relationship, and intentional infliction of emotional distress. J.A. at 40–55. On August 30, 2012, the District Court granted the parties' cross-motions for summary judgment, further ruling the breach-of-contract claims were not viable under a partnership theory.[1] *Queen v. Schultz*, 888 F. Supp. 2d 145, 164, 167 (D.D.C. 2012). Queen sought review of the order, which this Court affirmed in part, reversed in part, and remanded for further proceedings to permit Queen to proceed to a jury trial on his claim that the parties "formed a partnership to develop a television show and that

---

[1] The procedural posture of this case was succinctly summarized by the trial judge as follows:

> I just think that we're in this pickle right now in part because in my resolution of the summary judgment motion I addressed an implied partnership theory . . . . And before the Circuit I think defense counsel said it was appropriate for me to have addressed it, and so the Circuit proceeded to address it, and that put us all in this pickle.

J.A. at 330.

Schultz breached his duty of loyalty under District of Columbia partnership law." *Queen v. Schultz*, 747 F.3d 879, 889 (2014).

On remand, the District Court immediately set the case for trial. Schultz moved to continue trial, Docket 46, May 22, 2014, requesting discovery on the partnership issues, which the District Court granted, Docket 46, May 27, 2014. Schultz filed another motion for summary judgment, Docket 63, November 2014, which the District Court denied. Minute Order, November 26, 2014. Queen filed a motion for leave to file an amended complaint, in order to conform the complaint to the issues remanded by this Court. Docket 78, December 4, 2014. The District Court denied the motion. Minute Order, February 27, 2015. After a jury trial, the verdict was returned in favor of Schultz. J.A. at 342. Queen filed motions for a new trial, recusal, and attorneys' fees, *id.* at 344–68, which the trial court denied, *id.* at 410.

## II. RELEVANT FACTS

### A.    Evidence Developed at Trial

In January 2008, Queen met Schultz at the NBC station in Washington, D.C. *Id.* at 233. Queen gave Schultz a tour of the studio and discussed developing a television show created by Queen and

5

featuring Schultz as host (the "Show"). *Id.* Schultz agreed with the concept and the two verbally contracted to partner in developing the Show. *Id.* at 233–34. Queen recruited Max Schindler, an Emmy-award winning director, to join in developing and selling the Show. *Id.* at 191–92. After a series of negotiations, Queen, Schultz, and Schindler discussed forming a partnership, *id.* at 176, 178, wherein they would split profits 50/25/25, with Schultz receiving the 50 percent share,[2] *id.* at 191. Taking Schultz's word that the three men were forming a partnership, Schindler began promoting the Show through his connections. *Id.* at 226–27.

Queen likewise engaged in nonstop marketing. *Id.* at 236. Schultz would notify Queen of his television appearances, which Queen recorded and used to produce a "demo" DVD. *Id.* at 189–90. Schultz instructed Queen to obtain Schultz's radio show promotional packet. *Id.* at 235. Queen added a cover sheet and the demo DVD and sent the modified packet to various entities to pitch the Show. *Id.* Queen contacted CNN executives Phillip Kent and Henry Maulden, Delilah Loud at CBS in

---

[2] Schindler testified the partners verbally agreed to a three-way split of profits and the 50/25/25 split was for voting power. *Id.* at 228. Schultz testified he never gave Queen his word, orally or in writing, that they were partners in any television deal. *Id.* at 188.

Los Angeles, and other industry executives in an attempt to promote the Show. *Id.* at 194, 196–97.

Queen and Schindler repeatedly reminded Schultz of their agreement, requesting he execute a written contract to memorialize the terms of the verbal agreement. *Id.* at 229. On March 16, 2008, Schultz instructed his attorney, Jeffrey B. Landa, to send Queen and Schindler an email stating Schultz would sign a letter of understanding to form a partnership.[3] *Id.* at 178. Schultz consistently failed to execute a written contract, while encouraging Queen and Schindler to continue developing the Show. *Id.* at 211. Schindler left the partnership soon after because he "became very, very leery of a man who gave his word and didn't follow it up in a contract that he said he was going to sign." *Id.* at 230–31.

Following Schindler's departure from the partnership, Queen, equally concerned, approached Schultz and explained Schindler's apprehensions. *Id.* at 237. Queen chose to continue because Schultz

---

[3] The email provided the following proposed language: "This document serves as a letter of understanding in which Ed Schultz, Michael Queen and Max Schindler agree to form a partnership or corporation under the name 'Ed Schultz Productions' for any television broadcast opportunities that occur as a result of this agreement." *Id.* at 1786.

assured him in writing they were partners and promised Queen would be included in any television deal, specifically noting he would be included financially.[4] *Id.* Queen began production on the Show's pilot, booking NBC's Studio A; arranging the technical aspects, including hiring the director, crew, and graphic designer; managing the set design; and directing rehearsal, operations, editing, and post-production. *Id.* at 179, 238–43. Schultz controlled the content by writing the script and bringing in the guests. *Id.* at 179, 244. The pilot was shot

---

[4] Queen testified Schultz sent emails stating:

> Michael, any TV deal will involve you. I will not do a television deal without your involvement, and that includes a financial involvement. Mike, I will never screw you. Mike, you don't seem to trust me.

*Id.* In an April 5, 2008 email to Queen, Schultz wrote:

> I understand your concern about a financial arrangement moving forward. I can't give you specifics at this time. We do not know what we are dealing with at this point and what kind of opportunity may present itself. *However, any TV deal will obviously involve you. I will not do a TV deal without your involvement and that includes a financial involvement.* Rest assured, we are together on this. I hope this works for you at this point.

*Id.* at 1828 (emphasis added). Later, on May 28th, Schultz encouraged Queen to continue with the pilot, writing: "I'm not going to screw you or work with anyone else." *Id.* at 183, 1783. On June 8th, Schultz wrote Queen an email stating: "I really want you to be a partner but you seem to have a hard time trusting me and understanding that." *Id.* at 184, 1785.

on June 26, 2008, and Schultz agreed to reimburse Queen for the expenses he paid to produce the pilot. *Id.* at 182, 212.

Queen marketed the Show by sending the pilot to various networks and television stations, including CBS, CNN, MSNBC,[5] and NBC. *Id.* at 180, 213, 245–46, 1782. Queen negotiated an agreement with Alan Horlick, General Manager of a CBS affiliate WUSA, to broadcast the Show on Sunday mornings. *Id.* at 247–48. In February 2009, Schultz emailed Queen: "We have to keep working. You've done a great job putting the team together and getting things ready. I feel we are weeks away. We have to keep going." *Id.* at 186. Negotiations continued until Schultz grew impatient. *Id.* at 249. In February 2009, Schultz, independent of Queen, began negotiations with MSNBC President Phil Griffin to do *The Ed Show* at MSNBC. *Id.* at 181, 307. Schultz continued negotiations with Queen up until Schultz accepted employment with MSNBC. *Id.* at 308.

## B.    Pre-Trial Hearing

At the May 1, 2015 evidentiary hearing during the pretrial conference, the trial court ruled upon both parties' spoliation motions

---

[5] On April 22, 2008, Schultz emailed Queen, expressing his desire that the Show be picked up by MSNBC. *Id.* at 180, 306, 1782.

simultaneously. Queen's motion alleged, among other things, that Schultz destroyed emails despite various triggering dates for the preservation of electronically stored information. *Id.* at 83–85, 104.

Queen testified he produced every piece of evidence he had, including all of his emails. *Id.* at 106. Queen explained he sent a promotional package to Ben Silverman at NBC in April 2008. *Id.* at 109. A submission was later returned by NBC to Jeffrey Landa, Schultz's attorney. *Id.* at 110. It was Queen's belief that NBC mistakenly returned a submission to Landa because Landa had also pitched the show and sent a submission package without Queen's knowledge. *Id.* at 110–12. Landa testified that he forwarded the submission he received to Queen; Queen testified he never received it. *Id.* at 112. NBC's log shows there were two different submissions by Queen, one to Silverman and one to Barry Wallach, which were not returned. *Id.* at 113, 1709.

Schultz testified he has only had one personal email account since 1996. *Id.* at 114. He testified he periodically deletes emails and did not save any emails regarding this legal action or his relationship with Queen until he found out he was being sued in April 2009. *Id.* at 115. Queen argued Schultz's deletion of his emails was not done in good

10

faith, based on five different "trigger" dates. *Id.* at 118. In response, the trial judge stated: "I will tell you right now, the Court finds that date as a litigation trigger laughable. So if that's the basis for your sanctions motion, I don't see what else you have to say here." *Id.* at 119. She reiterated: "I've told you, March 3, 2008, laughable. Laughable." *Id.* at 120.

Landa testified he never sent a package to MSNBC, but received one from NBC when he was out of the office. *Id.* at 122–23. The cover letter provided: "In accordance with NBCUniversal's practice, the recent submission to Ben Silverman and Barry Wallach of Ed Schultz's material have been forwarded to NBCUniversal Law Department for a response." *Id.* at 125–26. Landa claims he instructed it be forwarded to Queen, *id.* at 126, but did not produce a mailing receipt or other documentation.

The Court denied both parties' motions, not finding sufficient evidence of bad faith to impose sanctions. *Id.* at 128–29. The Court also found Schultz had no subjective expectation of litigation until April 2009, and Queen failed to show a reasonable person would have been on notice that litigation was likely. *Id.* at 130.

Schultz next argued in a motion *in limine* that there be no testimony with respect to the alleged telephone records between Queen and Phil Griffin of MSNBC. *Id.* at 131. Queen's counsel F. Catfish Abbott affirmed the parties were in agreement on the motion. *Id.* at 132. The trial judge asked why the complaint contained an affirmative statement that telephone records existed when NBC produced no records to support the allegation, threatening counsel with Rule 11 sanctions. *Id.* at 132–33. Abbott stated Queen's prior counsel (whose motion to withdraw was granted by the court one week prior) had drafted the complaint. *Id.* at 133. When questioned further, Queen's co-counsel Steven Teppler stated Queen subpoenaed MSNBC, who responded no records existed. *Id.* at 134. Teppler stated that was the reason the allegation had been deleted in Queen's motion for leave to amend the complaint, which the court had denied. *Id.* at 135–36. Teppler noted the denial of the motion to amend "put us in a box." *Id.* at 136. The court granted Schultz's motion *in limine* without response. *Id.*

Finally, Schultz argued a motion *in limine* to preclude any evidence regarding emails from ten named individuals in response to Queen pitching the Show as hearsay. *Id.* at 137. Queen's counsel Abbott

12

relied on his opposition to the motion, which asserted all the communications between the parties and the named individuals fell under the business records exception. *Id.* at 140; *see id.* at 412–1707. In support, Queen testified the parties maintained regular communication in support of the partnership through email and Schultz would instruct Queen to pitch the Show to various individuals. *Id.* at 141–42, 145. Queen further testified he kept records of all these emails to memorialize the partnership and its communications. *Id.* at 141, 145. Queen testified all of the emails reflect his intent to effectuate a television show with Schultz and substantiate his claim that they were working together. *Id.* at 142–43.

The trial judge questioned Queen regarding the absence of certain emails from NBC Universal attorneys. *Id.* at 143.  Queen explained it was his practice to either email *or* physically mail promotional packets, which he would follow with a phone call. *Id.* at 143–45. Queen stated he kept the records to the best of his ability. *Id.* at 147. Queen testified he had no records after September 2009, because after Schultz was hired by MSNBC, Schultz refused any further contact. *Id.* at 146, 153.

Thereafter Queen was completely shut out of any contracts or revenue received by Schultz arising out of *The Ed Show*. *Id.* at 154.

The trial court granted Schultz's motion *in limine*. The court held the first prong of the business records exception was met, but Queen failed to meet any other prong. *Id.* at 156.   The court stated Queen's explanation of how he kept records fell short of the specificity necessary, because it was not clear who was responsible for keeping emails, which emails were required to be sent and retained, who was the designated custodian, which emails were considered vital communications among the partners, and whether the emails would be relied upon in the conduct of their business. *Id.* at 159–60. The trial court further opined the emails did not have all the indicia of trustworthiness. *Id.* at 162.

## C.    Trial

During *voir dire*, several jurors stated they believed a partnership should be in writing. Queen moved to strike each one, asserting bias. The judge denied the motions, because each juror stated they would apply the law as given. *Id.* at 166–68. The judge rejected Queen's request to question the potential jurors as to whether Queen would be

starting one step behind because he did not have a written contract. *Id.* at 168.

During opening statements, Schultz's counsel, John C. Hayes, Jr., aligned his client with the court, arguing Queen first "recalled" he was Schultz's agent, but the court "told him he wasn't an agent," and then Queen "remembered" he was under contract with Schultz, but the court "told him he didn't have a contract," and "[n]ow he's remembered he was a partner with Mr. Schultz." *Id.* at 170.

### i.    Queen's Case

Based on the pretrial ruling, Queen removed all the emails from the ten individuals listed in Schultz's motion *in limine*, *see supra* p. 13–14, and attempted to move the remaining emails into evidence at the outset of trial. *Id.* at 171. As instructed by the court, Queen's co-counsel Abbott had communicated with Schultz's counsel Hayes in order to come to an agreement with regard to the admissibility of the emails. *Id.* at 172–75. Hayes raised new objections at trial, parroting the issues presented by the judge in the pretrial hearing. *Id.* at 174–75. Refusing to admit the emails as a composite, the court required Abbott to introduce and admit each email individually. *Id.* at 175.

Queen's counsel Abbott questioned Schultz regarding the partnership contract proposed by Queen, asking Schultz to critique each page. *Id.* at 198. Abbott requested Schultz be permitted to step down and mark the portions he rejected with a red pen. *Id.* at 198–99. Abbott asked specific questions about each page of the contract. *Id.* at 200. After discussing each page, Schultz began ranting without directly answering the questions asked. *Id.* at 201–03. Abbott asked the trial judge to instruct Schultz to answer the question, which the judge refused. *Id.* at 203. There was an exchange between Abbott and the trial judge, after which the trial judge instructed Schultz to finish critiquing the agreement. *Id.* at 203–05. After a three-page (and minutes-long) diatribe by Schultz, while standing over the jury box, Abbott moved to strike the testimony as nonresponsive. *Id.* at 208. The judge stated: "Oh, it was fully responsive. Overruled." *Id.*

After Schultz's testimony, Queen attempted to play the video deposition of Phil Griffin, the MSNBC President. *Id.* at 214, 216. The court asked if the defense intended to play portions of Griffin's deposition as well, which Hayes confirmed. *Id.* at 215. The judge asked if there was overlap in the two videos and whether counsels previously

16

attempted to confer to play the video once to avoid redundancy. *Id.* Hayes responded, but the judge did not allow Queen's counsel Abbott to counter. *Id.*

During Schultz's former counsel Jeffrey Landa's testimony, the trial court supplied Hayes with an objection, *id.* at 217, and scolded Abbott in front of the jury, *id.* at 221 ("Well Mr. Abbott, how do you expect to just play something in front of the jury if it's not in evidence? You think I'm not going to notice?").

For witness availability purposes, Schultz presented Allan Horlick and Paul Woodhull as defense witnesses in the middle of Queen's case-in-chief. *Id.* at 251. On cross, Abbott asked Horlick whether he had received Queen's subpoena and subsequently called Abbott's law firm to inform them he would not honor the subpoena or attend trial. *Id.* at 255. Horlick denied receiving the subpoena or making the call, and Abbott continued with cross-examination. *Id.* During a bench conference Abbott tried to explain the situation, but the court scolded him and ordered him to apologize to the jury before allowing him to question his own client. *Id.* at 257–58, 266.

17

After defense witness Paul Woodhull testified, one of the juror's informed the court of his belief that Woodhull was his neighbor, has six children, their children play together, and described Woodhull's businesses. *Id.* at 262. The Court asked the juror two follow-up questions: (1) if he had ever spoken to Woodhull and (2) if he could be impartial. *Id.* at 262–63. Queen moved to excuse the witness, to which the court replied "All right, do have you have any response to Mr. Abbott's *motion to create an appellate issue*?" *Id.* at 264 (emphasis added). The court denied the motion. *Id.* at 265. This juror later became the jury foreman.

At the close of Queen's case-in-chief, Abbott attempted to enter the remaining emails that had not been individually entered as circumstantial evidence of fourteen months of partnership communications or under the state of mind exception. *Id.* at 271–87. The judge provided Hayes with his objection, *id.* at 274, and scolded Abbott outside the presence of the jury, *id.* at 293. The jury returned and Abbott moved the emails into evidence. *Id.* at 297. The judge admitted the emails, instructing the jury they were not offered for the

18

truth of their contents, but for the limited purpose of demonstrating Queen's state of mind. *Id.* at 298. Queen then rested his case.

### ii. Charging Conference

Discussing the proposed jury instructions, Hayes argued spoliation was only discussed pretrial and no evidence of Schultz deleting his emails had been introduced at trial. *Id.* at 300. However, as noted by Queen's counsel Teppler, Schultz admitted on the stand he had deleted his emails. *Id.* at 301. The judge sustained Hayes's objection and removed the entire spoliation instruction. *Id.* at 304.

Teppler requested a modification to "Formation of Partnership" proposal for the jury instructions, explaining intent is not required to form a partnership under D.C. law. *Id.* at 310. The judge responded that the statutory language was "bizarre." *Id.* at 311. Teppler asked to add the statutory language itself: "whether or not the persons intend to form a partnership." *Id.* at 317. The judge said it was confusing and denied the request. *Id.*

Later, Teppler proposed the "disassociation" instruction explain that if a partner, in a partnership for a particular purpose, dissociates before that particular undertaking has been completed, then that would

be wrongful dissociation. *Id.* at 323. The judge responded that such an instruction is "involuntary servitude." *Id.* at 324. The court said it would take all suggestions under advisement. *Id.* Hayes argued that Queen's theory was the agreement would span Schultz's entire life. The judge agreed with Hayes's view. *Id.* at 327. Teppler responded that it was never alleged this would be a life-long endeavor. Hayes countered that the proposed instruction would suggest Schultz could never dissociate himself and would be a "violation of the Thirteenth Amendment. That is involuntary servitude, your Honor." *Id.* at 329. The Court encouraged the assertion, stating: "[T]hat would be a very powerful argument to the jury." *Id.*

### iii.   Closing

Schultz referred to "indentured servitude" twice in his closing. *Id.* at 334–36. During Queen's closing, Abbott referred to the fact that while Queen produced 1200 emails, Schultz erased his emails. *Id.* at 337. Hayes objected, and the judge instructed the jury that the emails were "admitted with a limiting instruction that they were admitted simply for the plaintiff's state of mind." *Id.* at 338. After Abbott finished, Hayes objected to the statement that Schultz erased his emails

as contrary to the pretrial order and requested an instruction that it be disregarded. *Id.* at 339. Abbott attempted to explain that both Landa and Schultz testified Schultz did not produce any emails. *Id.* The trial judge told Abbott he did not ask Schultz if he erased his emails. *Id.* The judge instructed the jury: "Ladies and gentlemen, you heard reference in Mr. Abbott's rebuttal summation about the erasure of emails to Mr. Schultz. You are to disregard that. There's no evidence in the record about that." *Id.* at 340.

The jury returned its verdict in favor of Schultz. *Id.* at 342.

## SUMMARY OF ARGUMENT

The District Court committed errors and abuses of discretion during both pretrial and trial proceedings and erred in denying Plaintiff Queen's motion for recusal and new trial such that this Court should reverse and remand for a new trial before a different judge. The errors presented are summarized as follows:

First, the District Court erred in precluding Queen from admitting partnership emails under the business records hearsay exception, an issue of first impression for this Court. It was Queen's uncontested testimony that he regularly communicated by email in support of the partnership and in the ordinary course of business. Further, Queen must have been the records custodian, as Schultz did not maintain any emails regarding his relationship with Queen prior to litigation. The District Court erroneously found emails to be a less valid medium for business records and excluded the emails for reasons not raised by either party.

Second, Queen proffered a selection of the emails at trial as circumstantial evidence of fourteen months of partnership communication or under the state of mind hearsay exception. The

District Court hybridized these methods of admittance, instructing the jury that the emails were not offered for the truth of the matter asserted but for state of mind purposes only. The court reiterated this erroneous instruction in the middle of Queen's closing argument. The failure to properly admit or instruct the jury should not be considered harmless because, as noted by this Court, the emails were crucial to Queen's case, and therefore these compounded errors substantially affected the verdict.

Third, the District Court asserted Queen's partnership theory amounted to involuntary servitude and encouraged Schultz to present the argument to the jury in closing, which Schultz subsequently declared twice. This improper and inflammatory assertion was made before a panel that included five African-American jurors and constitutes plain error as an unsupported misstatement of the law intended only to provoke the animosity of the jury.

Fourth, the District Court erroneously permitted Schultz to exploit the judicial imprimatur at the outset of trial by repeatedly stating Queen presented an agency, contract, and partnership theory and each time "the Court told him" the relationship didn't exist. The

court allowed Schultz to present these arguments to the jury that were not susceptible of proof, but intended to influence the jury in reaching a verdict, which ultimately substantially and adversely affected Queen's rights.

Fifth, the District Court abused its discretion in denying Queen's pretrial motion for spoliation where it repeatedly called one of five proposed litigation hold trigger dates "laughable" and then failed to address the remaining dates or the allegation that Schultz's counsel Landa bore equal responsibility for compliance. The court likewise erred in denying Queen's request for a spoliation instruction and in instructing the jury to disregard Queen's assertion in closing that Schultz had deleted all of his emails, when Schultz had admitted on the stand he did not produce any emails, because he had erased them.

Finally, Queen asserts the cumulative effect of the District Court's errors and remarks during both pretrial and trial proceedings left an abiding impression of actual bias or, at the very least, an appearance of bias. In addition to the individual errors asserted above, the District Court further acted to:

- threaten Queen's co-counsel Abbott and Teppler with unwarranted Rule 11 sanctions;

24

- belittle Abbott as a Jacksonville, Florida attorney who does not understand the "highly educated, experienced, professional people [of] Washington, D.C.";
- empower Schultz to refuse to answer questioning, reach into the jury box, and go on a tirade before the jury;
- provide Schultz's counsel with objections;
- scold Abbott twice in the presence of the jury;
- compel Abbott to apologize to the jury, judge, and opposing counsel before questioning his own client;
- refuse to remove the jury foreman, despite his admission he might know a witness and even though alternate jurors were available;
- call Queen's counsel's plain reading of the D.C. partnership statute "bizarre";
- accuse Queen's counsel of creating appellate issues; and
- admit the court would give Queen's counsel's arguments less weight.

Queen asserts the trial court's behavior throughout the entire record demonstrated a high degree of favoritism toward Schultz and antagonism towards Queen and his counsel. Accordingly, Queen respectfully requests this Court reverse the District Court's judgment and order denying Appellant's motion for new trial and recusal, and remand this action for a new trial before a different judge.

# ARGUMENT

## I. THE DISTRICT COURT REVERSIBLY ERRED IN FAILING TO ADMIT THE COMPOSITE OF EMAILS AS BUSINESS RECORDS.

Evidentiary rulings on business records are reviewed for abuse of discretion. *See United States v. Fahnbulleh*, 752 F.3d 470, 478 (D.C. Cir. 2014). Federal Rule of Evidence 803(6) permits admission of records as a hearsay exception if: (A) the records were made at or near the time by someone with knowledge; (B) the records were kept in the course of a regularly conducted activity of a business; (C) making the records was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or qualified witness; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness. *Id.*

Here, Schultz filed a motion *in limine* to preclude Queen from offering any evidence regarding statements made by ten named individuals as inadmissible hearsay. J.A. at 137. In opposition, Queen asserted the emails between the parties and individuals should be admitted under the business records exception. *Id.* at 139–41; *see Id.* at 412–1707. The trial judge found the contemporaneous element

26

established, but held Queen failed to meet the remaining prongs of the exception. *Id.* at 156.

In rendering its opinion, the trial court began by stating Queen had an "uphill battle in introducing e-mails," relying on *United States v. Cone*, 714 F.3d 197 (4th Cir. 2013). In *Cone*, the Fourth Circuit reviewed a district court's decision to admit certain customer emails for a non-hearsay purpose, but it declined to give a limiting jury instruction. *Id.* at 219. The government argued the admission was not error because the emails fell under the business records exception, even though no testimony had been produced to satisfy the foundational requirements. The Fourth Circuit noted conflict amongst courts because email may be considered too casual to expect the same degree of accuracy as would be expected in more traditional business records, quoting an unpublished opinion from a Maryland District Court case. *Id.* at 219–20 (quoting *It's My Party, Inc. v. Live Nation, Inc.*, 2012 U.S. Dist. LEXIS 119625, *15, 2012-2 Trade Cas. (CCH) P78,034, 2012 WL 3655470 (D. Md. Aug. 23, 2012)). However, the court acknowledged: "As email is more commonly used to communicate business matters both internally and externally . . . more formal paper records are becoming

more unusual." *Id.* (citation omitted). Ultimately, the court held a "district court's observation that the e-mails were kept as a 'regular operation of the business' is simply insufficient *on that basis alone* to establish a foundation for admission under Rule 803(6)(B)." *Id.* at 220 (emphasis supplied).

*Cone* has since been interpreted as "reinforcing the axiomatic notion that emails should not be treated any differently than any other business record for purposes of Rule 803(6)." *United States v. Parnell*, 2015 U.S. Dist. LEXIS 68778, 97 Fed. R. Evid. Serv. (Callaghan) 896 (M.D. Ga. May 28, 2015). Additionally, *Cone* is clearly distinguishable from the present case as here the trial court did not fail to include a limiting instruction, but rather erred in considering emails to be a less valid form of a business record based solely on its medium. Further, in *Cone*, the emails at issues were from customers; here, they were from actual or potential business associates at television networks.

As a preliminary issue, Queen asserts the partnership constituted a business for the hearsay exception. Queen has been unable to find any decisional authority from this Court applying the exception to partnerships, but it should be noted that even if the relationship did not

28

constitute a partnership (which Queen does not concede) that would not render the exception inapplicable. *See United States v. Ferber*, 966 F. Supp. 90, 98-99 (D. Mass. 1997) ("A business record, of course, need not be generated in a 'business'; the records of . . . individual households . . . may properly qualify as business records.); *Keogh v. Commissioner of Internal Revenue*, 713 F.2d 496, 500 (9th Cir. 1983) (finding a personal financial diary admissible under 803(6)). In fact, "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also United States v. Dupree*, 2015 U.S. App. LEXIS 13027, at *10 (2d Cir. N.Y. July 28, 2015) (quoting *Phoenix Assocs. III*).

In *Fahnbulleh*, this Court affirmed the admission of 10,000 pages of raw data under the business records exception. 752 F.3d 470, 478 (2014). This Court focused on the regularity of the production of the data that "were prepared by . . . employees as part of their job responsibility" and "were maintained in the ordinary course of business." *Id.* at 479. This Court noted there was no evidence presented that the reports were not reliable. *Id.*

Likewise here, Queen and Schultz testified they maintained regular communication in support of the partnership through email and the partners had agreed Queen would pitch the Show to various individuals in an attempt to get it picked up by a network. J.A. at 141–42, 145. Queen stated Schultz would give him documents to send to the individuals and it was Queen's regular practice to draft emails providing those documents, followed by a phone call to confirm receipt. *Id.* at 142–44. Queen prepared these emails as part of his responsibility to the partnership and maintained the drafts and the responses in the ordinary course of business. *Id.* at 152–53.

Furthermore, Queen was clearly the records custodian, as he produced 1100 pages of emails, *id.* at 107, while Schultz testified he regularly deletes his email and did not save *any* emails regarding his relationship with Queen prior to the start of litigation, *id.* at 115. Queen presented testimony that the emails were generated regularly from an email account maintained by him and were a regular and integral part of the partnership activities with Schultz. The fact that Queen was otherwise employed in television is irrelevant to his qualification to be the records custodian for the partnership. *See Phoenix Associates III*, 60

F.3d at 101 (finding a custodian's "source of employment" irrelevant); *Dupree*, 2015 U.S. App. LEXIS 13027, at *10 ("Our cases call for 'a very broad interpretation' of the rules governing qualification of a witness to lay a foundation for admission of business records."). It appears even Schultz's lawyer was aware of the partnership roles because when a submission package of "Ed Schultz's material" was delivered to Landa's office, he testified he forwarded it to Queen—not Schultz. J.A. at 124–26.

The final prong of Rule 803(6) provides "*the opponent* does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *See* Fed. R. Evid. 803(6)(E). *See also Pacheco v. Universal Ins. Grp., Inc.*, No. 13-1459 (JAG), 2015 U.S. Dist. LEXIS 177311, at *41 (D.P.R. Feb. 9, 2015) ("This rule has recently been amended to clarify that, if the proponent has established the stated requirements of the exception—regular business with regularly kept record, source with personal knowledge, record made timely, and foundation testimony or certification—then *the burden is on the opponent* to show the source of information or the

31

method or circumstances of preparation indicate a lack of trustworthiness in order to defeat admissibility.") (emphasis added).

Here, opposing counsel only cross-examined Queen regarding (1) whether the partnership had a physical location, file cabinets, or filed a tax return; (2) whether Queen was otherwise employed; and (3) whether Queen continued to keep email records *after* Schultz began his show on MSNBC. J.A. at 146–52. None of these arguments are relevant to the business records exception. The trial judge, however, excluded the emails on the *possibility* of double and triple hearsay or "puffery," reasons not raised by either party. *Id.* at 154–63. These arguments, not raised by "the opponent," were waived. *See United States v. Smith*, 804 F.3d 724, 729 (5th Cir. 2015) ("[T]he burden of establishing that a piece of evidence lacks trustworthiness is on its opponent.").

The failure to properly admit the proffered evidence should not be considered harmless because partnership communications were principally done by teleconference or email, the emails were not cumulative of other evidence presented at trial, and the existence of a partnership was a question of fact for the jury. The emails were a crucial part of Queen's case, as noted by this Court in its mandate, and

32

it cannot be said that the trial judge excluding the evidence did not substantially affect the verdict. Accordingly, for all of the reasons described above, Queen asserts the trial court abused its discretion, requiring reversal and a new trial before a different judge.

## II. THE DISTRICT COURT REVERSIBLY ERRED IN PROVIDING A LIMITING INSTRUCTION THAT HYBRIDIZED "NOT HEARSAY" AND THE STATE OF MIND HEARSAY EXCEPTION.

A challenge to the language of a jury instruction is reviewed for abuse of discretion. *United States v. McGill*, Nos. 06-3190, 06-3193, 07-3001, 07-3003, 07-3065, 07-3124, 2016 U.S. App. LEXIS 3734, at *77 (D.C. Cir. Mar. 1, 2016) (citing *United States v. Dickerson*, 163 F.3d 639, 641 n.3, 333 U.S. App. D.C. 348 (D.C. Cir. 1999)). "[T]he central question is 'whether, taken as a whole, they accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards.'" *Id.* at *76–77 (quoting *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997)).

At trial, Queen removed all emails from the ten individuals listed in the motion *in limine* and attempted to move the remaining emails into evidence. J.A. at 171. Pursuant to the court's instruction, the parties had conferred to come to an agreement with regard to the

emails' admissibility, redacted in accordance with the pretrial ruling. *Id.* at 172–75. However, Schultz raised new objections, parroting the issues raised by the judge in pretrial. *Id.* at 174–75. The judge ruled that each email from the composite—consisting of approximately 1100 pages—must be entered individually. *Id.* Queen admitted emails one by one throughout trial and then proffered the remaining emails at the close of his case-in-chief, as circumstantial evidence of fourteen months of partnership communications and under the state of mind exception.[6] *Id.* at 269–87.

> The judge admitted the emails, but instructed the jury as follows:
>
> Plaintiff's Exhibit 1E with this stack of 226 pages of e-mails are not offered for the truth of anything said in these e-mails. They're offered for a limited purpose. That limited purpose is to provide information about the state of mind of the plaintiff during the course of these e-mail communications, not for the truth of what's indicated in these 226 pages.

*Id.* at 298.

---

[6] In her order, the judge stated Queen "failed to introduce the email into evidence until after he rested his case in chief," *id.* at 374, but he was "permitted to reopen his case," *id.* at 374 n.6. In fact, Queen stated he wanted to proffer before he rested: "I think I'm ready to rest. I only have two proffers I'd like to make *before I rest* so if you want to take the jury out, I'll make my proffers and rest and he can make his motion. Whatever the Court wants, however you want to do it. . . . *Other than my proffer*, Your Honor, the plaintiff would rest." *Id.* at 269–70 (emphasis added).

This instruction is erroneous as it conflates the two proffered bases of admittance and essentially instructs the jury to ignore the evidence in its entirety. In accordance with the pretrial ruling, the emails were comprised only of emails between the parties. All the emails written by Schultz would *not* have been hearsay, but admissions by a party opponent under Rule 801(d)(2). The emails written by Queen were admissible as either (1) *not* hearsay if offered *not* for the truth of the matter but as circumstantial evidence of knowledge, intent, attitude, or belief during fourteen months of partnership communications or words that have independent legal significance as to the intent or existence of the partnership; or (2) offered *for the truth of the matter asserted* as evidence of the declarant's state of mind under Rule 803(3). The court further erred in reiterating its instruction in the middle of Queen's closing argument. *Id.* at 338.

As with Issue I, the failure to properly instruct the jury as to the proffered evidence should not be considered harmless because the existence of a partnership was a question of fact for the jury, courts presume the jury follows the district court's instructions, and the emails were a crucial part of Queen's case. Therefore, improperly instructing

the jury as to the proper scope of this evidence substantially affected the verdict.

Accordingly, for all of the reasons described above, Queen asserts the trial court abused its discretion, requiring reversal and a new trial before a different judge.

## III. THE DISTRICT COURT REVERSIBLY ERRED IN ENCOURAGING AND PERMITTING SCHULTZ TO REFERENCE INDENTURED SERVITUDE IN CLOSING ARGUMENT BECAUSE IT WAS A PREJUDICIAL ARGUMENT BEFORE A PREDOMINATELY AFRICAN-AMERICAN JURY, A MISREPRESENTATION OF THE LAW AND THE FACTS, AND WAS NOT PLEAD AS A DEFENSE.

Improper arguments made in closing without an objection are reviewed for plain error. *See United States v. Reed*, 522 F.3d 354, 360 (D.C. Cir. 2008). To establish "plain error," Appellant must show (1) deviation from a legal rule; (2) the error was clear or obvious; (3) the error affected Appellant's substantial rights; and (4) the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Payne v. Stansberry*, 760 F.3d 10, 14 (D.C. Cir. 2014). "In evaluating the potential prejudice from an improper statement in closing argument, this court typically looks to the centrality of the issue affected, the severity of the . . . misconduct, the steps taken to mitigate

36

the misconduct, and the closeness of the case." *Reed*, 522 F.3d at 360 (quoting *United States v. Venable*, 269 F.3d 1086, 1091 (D.C. Cir. 2001)) (emphasis omitted).

During the charging conference, Queen's counsel suggested language for the jury instruction on wrongful dissociation, to which the trial judge responded: "You join a partnership, and it is involuntary servitude until the completion of the undertaking. You are truly standing here without blushing and asking me to instruct a jury that that's the law of this District?" J.A. at 324. Thereafter, Schultz's counsel asserted Queen's theory amounts to a violation of the Thirteenth Amendment's antislavery prohibition against indentured servitude. *Id.* at 329; *see* U.S. Const. amend. XIII. In response, the Court encouraged Schultz stating: "[T]hat would be a very powerful argument to the jury." *Id.* Schultz thereafter expressly referred to indentured servitude twice in his closing. *Id.* at 334–36.

Whether the relationship between the parties constituted a partnership was the main issue in the case. Reference to involuntary servitude during closing argument was improper and inflammatory, particularly for the five African American jurors, and "so prejudicial

that no instruction from the Court could have cured them." *In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F.Supp. 2d 74 (D.C. Cir. 2006). Regardless, the trial judge made no attempt to do so. Argumentative appeals to historical racial prejudices are just as improper in a civil trial as a criminal one. *See Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th Cir. 2001).

Beyond simply permitting this prejudicial argument to be made to the jury, the trial judge also erred in suggesting and encouraging its use. *See Payne v. Stansberry*, 760 F.3d 10, 16 (D.C. Cir. 2014) (noting a "structural error" may be "so intrinsically harmful" as to satisfy the third and fourth prongs of the plain error test and require automatic reversal); *United States v. Wilson*, 240 F.3d 39, 44 (D.C. Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, 8–9 (1999)) (noting adjudication by a biased judge qualifies as a structural constitutional error).

Because objecting to an argument provided to opposing counsel by the trial judge would obviously be fruitless, Queen had no choice but to address the jury regarding the allegation of indentured servitude in order to mitigate the unfair prejudice. After the trial, Queen raised the

issue in his motion for new trial. J.A. at 361–62. The trial court, however, failed to address the fact it suggested the argument prior to its use. *See id.* at 400–02. Instead the court obfuscated the issue by claiming Queen "apparently faults the Court for not *sua sponte* interrupting defense counsel in the midst of closing argument." *Id.* at 400. The issue raised by Queen in his motion was not only that "indentured servitude" was used in Schultz's closing, but that "the Court *encouraged* defense counsel to use this argument in its closing," and further that the defense was not pled, included in the jury instructions, or supported by the evidence. *Id.* at 361–62 (emphasis added).

The court attempted to further confuse the issue by stating Schultz never referred to the Thirteenth Amendment or to "involuntary servitude" during his closing at all. *Id.* at 400 n.21. The court opined that Schultz's closing merely used a "provocative inference from the evidence" to "highlight the absurdity of the plaintiff's theory." *Id.* at 401. It continued: "The defense counsel's reference to indentured servitude was a reasonable—albeit provocative—inference drawn from

the plaintiff's own theory of the case and does not warrant a new trial." *Id.* at 402.

In asserting that Schultz did not refer to "involuntary servitude" which he in fact referred twice to "indentured servitude," the trial court made a distinction without a difference. *See United States v. Shackney*, 333 F.2d 475, 484 n.13 (2d Cir. 1964) ("Whatever doubt there may have been as to the applicability of ['involuntary servitude'] to a condition of compulsory service voluntarily entered was dispelled by the time [the words] were incorporated into the 13th Amendment."); *see, e.g., Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 455 n.7 (Tenn. Ct. App. 2009) (accepting the use of "involuntary servitude" and "indentured servitude" interchangeably as an assertion of "involuntary servitude").

Moreover, the use of the phrase in this case was not a *reasonable, but provocative inference*, but a misstatement of the law. Involuntary servitude is defined as "a condition of servitude in which the victim is *forced to work* for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Calicchio v. Sachem Cent. Sch. Dist.*, No. 14-CV-5958 (DRH) (SIL), 2015 U.S. Dist. LEXIS 139001, at *5 (E.D.N.Y.

40

Oct. 13, 2015) (quoting *United States v. Kozminski*, 487 U.S. 931, 952 (1988)) (emphasis added); *see Kaveney v. Miller*, CIVIL ACTION NO. 93-0218, 1993 U.S. Dist. LEXIS 10784, at *7 (E.D. Pa. July 30, 1993) (quoting *Shackney*, 333 F.2d at 486, 487) ("*The essence of indentured servitude is the premise that the employee must have no other alternative.* The availability of a choice, however painful, renders a claim for involuntary servitude invalid.") (emphasis added) (internal citations omitted).[7] No partnership existing under District of Columbia law could ever impose indentured servitude, as dissociation is available for voluntarily terminating the partnership. However, the trial court also refused to permit a disassociation instruction, which would have clarified that issue for the jury. Also left unaddressed by the trial court was the fact that the jury was not provided with an instruction regarding the elements and burdens of proof of indentured servitude.

---

[7] *See also Nat'l Conf. of Pers. Managers, Inc. v. Brown*, No. CV 12-09620 DDP (RZx), 2015 U.S. Dist. LEXIS 106830, at *19 (C.D. Cal. Aug. 13, 2015) ("To prove compulsion, the plaintiff must show that he had, or believed he had, no choice but to continue his state of servitude."); *Crawford v. Louisiana*, No. 14-1190, 2015 U.S. Dist. LEXIS 23544, at *11–12 (E.D. La. Feb. 26, 2015) ("Application of the Thirteenth Amendment should be confined to those situations that are truly akin to the slavery that gave rise to it."). *But see Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 648, 665 (N.D. Miss. 2013) (quoting U.S. Const. amend. XIII) ("The Thirteenth Amendment by its plain language excludes from its protections those who are sentenced to *indentured servitude 'as a punishment for a crime whereof the party shall have been duly convicted.'*") (emphasis added).

Labeling the comment as "provocative" only validates Queen's claim before this Court, as it reveals the argument was supplied and asserted only to *provoke* the jury's animosity towards a claim the trial court already considered "absurd." Accordingly, Queen submits the defense counsel's references to the Thirteenth Amendment's prohibition of indentured servitude to the jury were so clearly improper, inflammatory, and prejudicial that it provides sufficient basis for reversal for a new trial before a new judge.

## IV. THE DISTRICT COURT REVERSIBLY ERRED IN PERMITTING SCHULTZ TO REFER TO THE PRETRIAL DISMISSAL OF THE CONTRACT AND AGENCY COUNTS IN OPENING STATEMENTS BECAUSE OF THE PREJUDICIAL INFLUENCE OF THE JUDICIAL IMPRIMATUR.

This issue will also be reviewed for plain error. *See United States v. Williams-Davis*, 90 F.3d 490, 507 (1996). In *Arizona v. Washington*, the United States Supreme Court affirmed the narrow purpose and scope of a legitimate opening statement:

> [T]o state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. . . . [I]t is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict.

42

434 U.S. 497, 513 n.32 (1978) (quoting *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring)).

Here, after reviewing its grant of summary judgment, this Court instructed the trial court to allow Queen to present his claim of partnership to the jury. At trial, Schultz's counsel presented the following in his opening statement:

> Mr. Queen sued Mr. Schultz, and first he recalled that he had an agreement to be Mr. Schultz's agent in this deal. *The Court told him he wasn't an agent.*
>
> Then he remembered he had a contract with Mr. Schultz for this deal. *The Court told him he didn't have a contract.*
>
> Now he's remembered he was a partner with Mr. Schultz, and I'm going to go through the evidence in this case now for a few minutes which will demonstrate to you there never was a partnership.

J.A. at 170 (emphasis added).

In allowing Schultz to exploit the judicial imprimatur to unduly influence the jury at the outset of trial in order to give disproportionate weight in its credibility determination, and in its failure to provide a curative instruction, the trial court allowed the trial to be tainted from the very start. In fact, the trial court noted this issue itself when ruling on the motion for new trial. *Id.* at 399 ("To be sure, defense counsel's

invocation of prior Court rulings in his opening statement might be thought to cloak the opening statement with the Court's imprimatur.").

Moreover, as noted by the Supreme Court in *Arizona*, it is fundamentally unfair to present the jury with statements not susceptible to proof, but intended to influence the jury. The trial court's rulings constituted hearsay, which were not admitted and not capable of being admitted under an exception. *See Herrick v. Garvey*, 298 F.3d 1184, 1191–92 (10th Cir. 2002) (finding a prior judgment offered for the truth of the matter asserted to be inadmissible hearsay because "[j]uries are likely to give disproportionate weight to such findings of fact because of the imprimatur that has been stamped upon them by the judicial system.").

Accordingly, Queen submits defense counsel's opening statement provides sufficient basis for reversal for a new trial before a new judge.

## V. THE DISTRICT COURT REVERSIBLY ERRED IN DENYING QUEEN'S PRETRIAL MOTION FOR SPOLIATION BECAUSE IT FAILED TO CONSIDER ALL OF SCHULTZ'S TRIGGER DATES AFTER IT FOUND ONE OF THE PROPOSED DATES "LAUGHABLE" AND FURTHER FAILED TO ADDRESS WHETHER SCHULTZ'S COUNSEL LANDA ALSO HAD A DUTY TO PRESERVE SCHULTZ'S EMAILS.

A district court's order on a discovery sanctions motion is reviewed for abuse of discretion. *See Parsi v. Daioleslam*, 778 F.3d 116, 125 (D.C. Cir. 2015). The District Court for the District of Columbia recently summarized:

> A party has an obligation to preserve . . . documents it knows or reasonably should have known were relevant to the present litigation if it knows the destruction . . . of those documents would prejudice the opposing party. A party that fails to preserve evidence runs the risk of being justly accused of spoliation—defined as the destruction . . . of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation— and find itself the subject of sanctions.

*Landmark Legal Found. v. EPA*, 82 F. Supp. 3d 211, 219 (D.D.C. 2015) (internal citations, alterations, and quotation marks omitted). *See also Clarke v. Wash. Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 19–20 (D.D.C. 2012) (citing *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995)) ("Once a party anticipates that it will be subject to litigation, the party has a duty to preserve any evidence that may be potentially relevant."). "[A] party seeking an issue-related sanction need only put forth a preponderance of the evidence." *Id.*

Queen filed a Motion for Sanctions and Award for Attorney's Fees, requesting an evidentiary sanction against Schultz. J.A. at 82, 128–30.

Schultz testified he deleted all of his emails regarding his relationship with Queen prior to April 2009. *Id.* at 115–16. In the motion, Queen set forth five litigation triggers for the preservation of evidence: (1) an email from Schultz to Queen, Schindler, and Schultz's counsel Landa on March 3, 2008; (2) an email from Schultz to Queen on March 5, 2008; (3) an email from Landa to Queen and Schultz on March 16, 2008; (4) an email from Schultz to Queen on April 5, 2008; and (5) an email from Schultz to Queen on May 28, 2008, wherein he unequivocally acknowledges a potential legal problem when he states: "Listen, can we leave all that legal stuff at waters [sic] edge until we know what we're dealing with? . . . I'm not going to screw you or work with anyone else." *Id.* at 83–85.

The trial court denied Queen's motion and repeatedly called his first trigger date "laughable." *Id.* at 119–20, 127. The court did not address any of the other dates, merely stating Queen's motion failed to "show that a reasonable person would have been on notice that litigation was likely." *Id.* at 130. The trial court reasoned:

> Many of these e-mails, from what I can see, show nothing more than the defendant and the plaintiff discussing a potential business deal and merely asserting that lawyers should or should not review any potential contract or

> agreement. This is not evidence, standing by themselves, of a
> potential for litigation but, rather, people astutely trying to
> be careful about detailing precise terms of what they're
> agreeing to.

*Id.*

Queen asserts that including his attorney in negotiating and drafting partnership agreements and encouraging Queen to "leave all that legal stuff at waters edge" demonstrates Schultz's subjective anticipation of litigation. Further, Schultz's acknowledgment of Queen's concerns about being "screwed" by Schultz indicates a reasonable anticipation of litigation had been triggered. Even if the applicable trigger date was April 2009, as the trial court held, Schultz failed to produce any emails after that date.

The lower court also entirely failed to address Queen's other allegation: Landa breached *his* duty to ensure Schultz preserved documents. *Id.* at 88. Landa bore equal responsibility for compliance once the preservation obligation was triggered because of his involvement as counsel, first on the partnership's behalf, and then on Schultz's behalf. *Id.* at 82–84.[8] *See Zhi Chen v. District of Columbia*, 839

---

[8] Schultz admitted during his July 2014 deposition that Landa represented the interests of the partners. *Id.* at 97–98. Because Landa at various times represented

F. Supp. 2d 7, 12 (D.D.C. 2011) ("[The preservation] obligation 'runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.'").

At trial, Queen requested a spoliation instruction, which the Court denied. J.A. at 300–04. For the same reasons the pretrial motion for spoliation should have been granted, this instruction should have been permitted. Even if the lower court had found Schultz's nonproduction of emails unintentional, which Queen does not concede, a permissive instruction would have been appropriate. *See, e.g.*, *Beck v. Test Masters Educ. Servs.*, 289 F.R.D. 374, 380 (D.D.C. 2013).

Finally, the court erroneously instructed the jury to disregard Queen's assertion in his closing that Schultz had deleted all his emails stating "[t]here's no evidence in the record about that." J.A. at 340. As correctly asserted by Queen's counsel, Schultz admitted on the stand he did not produce any emails because he had erased them. *Id.* at 177.

---

both the partnership and Schultz individually, Landa's obligation as counsel ran to both the partnership, and to each of the partners, and was triggered at least as early as the time Schultz sent the March 3, 2008 email to Queen.

Queen demonstrated both Schultz and Landa had a reasonable anticipation of litigation, had a corresponding duty to preserve relevant documents and emails, and both breached that duty with a culpable state of mind, causing prejudice to Queen. Accordingly, Queen asserts the trial court abused its discretion in denying the motion for sanctions, providing a sufficient basis for reversal for a new trial before a new judge.

## VI. THE DISTRICT COURT REVERSIBLY ERRED THROUGH ITS CONTINUING AND CUMULATIVE DEMONSTRATIONS OF BIAS BECAUSE IT CAUSED SERIOUS AND UNFAIR PREJUDICE AND DEPRIVED QUEEN OF HIS DUE PROCESS RIGHTS.

"To demonstrate a violation of due process because of judicial bias, a claimant must show either actual bias or an appearance of bias." *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010). Judicial rulings, opinions, and remarks establish a basis for bias or partiality if they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see Czekalski v. Lahood*, 589 F.3d 449, 457 (2009); *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 848 (1995). Queen moved for recusal on this matter below, which the trial court denied.

This Court has held:

> In reviewing a claim of judicial bias, we must determine whether the judge's behavior was so prejudicial that it denied [the appellant] a fair, as opposed to a perfect, trial. . . .We require that a judge remain a disinterested and objective participant in the proceedings . . . . A finding of judicial bias must be based on an abiding impression left from a reading of the entire record, not from particular comments or rulings considered in isolation.

*United States v. Edmond*, 52 F.3d 1080, 1099 (1995) (internal citations, quotation marks, and alterations omitted).

Queen asserts each individual error above is sufficient to support reversal. Queen additionally asserts the cumulative effect of these errors establishes judicial bias or, at the very least, an appearance of bias, in addition to the numerous unfavorable rulings, snide remarks, and scolding from pretrial through post-trial orders.

## A. Pretrial

In addition to the errors asserted above regarding the trial court's ruling on the motion for spoliation, *supra* Part V, and the motion *in limine* regarding the composite of emails as business records, *supra* Part I, the following excerpts highlight the judge's demeanor towards Queen's counsel evident throughout the entire record. During the

evidentiary hearing, Queen's counsel Abbott began by calling Schultz's

counsel Landa to the stand and proceeded as follows:

> [MR. ABBOTT:] Mr. Landa, the Court is interested about
> the MSNBC package that went to Burbank and then came to
> your office. You and—
> THE COURT: Can I correct you, Mr. Abbott?
> MR. ABBOTT: Yes, sir [sic].
> THE COURT: I am not the least bit interested in this, except
> to the extent that both parties have made factual—raised
> factual disputes about this issue.
> MR. ABBOTT: Right. That's what I'm trying to get to.
> THE COURT: Do you understand that?
> MR. ABBOTT: Yes, I do. I'm going to get to it.
> THE COURT: All right.

J.A. at 121.

When discussing Schultz's motion *in limine* regarding alleged

telephone records between Queen and MSNBC President Phil Griffin,

Queen affirmed the parties were in agreement on the motion. *Id.* at

131–32. The trial court proceeded to threaten Queen's counsel with Rule

11 sanctions, despite the fact Queen's previous counsel (who had

authored the complaint) had been permitted to withdraw as counsel one

week before and Queen's present counsel had filed a motion to amend

the complaint to remove the allegation at issue, which had been denied

by the court. *Id.* at 132–36.

**B. Trial**

51

During *voir dire*, Queen was denied the opportunity to ask additional questions of jurors who stated they believed a partnership should be in writing. *Id.* at 166–68. When he moved to exclude certain jurors, the trial judge stated:

> I think that there are going to be a number of highly educated, experienced, professional people who sit as jurors in the Washington, D.C. area, and I am telling you, Mr. Abbott, they are probably all going to have the view expressed by both Jurors 57 and 490, and we may never get a jury if I exclude them because they have such strong views about how they conduct their own personal business and what they think is the preferred way to conduct business.

*Id.* at 167–68.

As fully addressed above, the trial court then permitted Schultz to align himself with the court during opening statements by arguing Queen made previous attempts to allege different relationships with Schultz, which the court "told him" did not exist. *See supra* Part IV.

### i.    *Queen's Case-in-Chief*

Queen called Schultz to the stand as his first witness and asked Schultz to critique a demonstrative exhibit of the partnership agreement proposed by Queen. *Id.* at 198. After discussing each page of the document, Queen's counsel Abbott asked Schultz whether he had

informed Queen he did not agree with certain portions, which Schultz

would not answer directly. *Id.* at 201–03. The following then occurred:

> MR. ABBOTT: Your Honor, would you instruct the witness
> to answer the question?
> THE WITNESS: I'm answering the question.
> THE COURT: He is answering the question. You are asking
> him, you gave him a red marker, which you now have in
> your hand, and you said criticize this document and that's
> exactly what he's doing. You asked for this, Mr. Abbott. Now,
> do you have another question, Mr. Abbott?
> MR. ABBOTT: Yes, I do.
> BY MR. ABBOTT
> > Q. Did you ever make a counter offer or tell them any
> > of the things that you just told the jury or did you just
> > keep working on it?
> > A. As soon as I got this, I forwarded this to my
> > attorney. And the first e-mail back—I'm not done, Mr.
> > Abbott.
> > Q. Okay?
> > A. The first e-mail back that I got from my attorney
> > and the first line it said Ed, please do not sign this.
> MR. ABBOTT: Your Honor, I would object. The witness is
> lecturing the jury, he's two feet from the jury box.
> THE COURT: Mr. Abbott, you asked Mr. Schultz to step
> down from the witness stand.
> MR. ABBOTT: I did and I'm asking you—
> THE COURT: He is standing where he is because you asked
> him to step down from the witness stand.
> MR. ABBOTT: I did not ask—
> THE COURT: Now you've also asked him to criticize
> everything on that page. What number are you at, Mr.
> Abbott?
> MR. ABBOTT: Your Honor, for the record, he's standing one
> foot from the jury box and leaning in. I'm asking you to tell
> him that's not proper behavior.

> THE COURT: It's perfectly appropriate behavior. He's standing up.
>
> BY MR. ABBOTT:
>
> > Q. Can I ask you another question?
> >
> > A. Yes, sir, yes, sir.
> >
> > Q. Did you ever write back and say—
>
> THE COURT: Mr. Abbott, you have, he has not completed criticizing that document. Didn't you say there were five things on there?
>
> MR. ABBOTT: Your Honor, I'm sorry. I guess, are you instructing me how to question the witness, is that it?
>
> THE COURT: I am saying that you have asked the question at the outset asking him to criticize that document. Mr. Schultz, the witness has said he has not finished criticizing that document, he's only gotten to number three. So let him finish answering your original question without cutting him off.
>
> MR. ABBOTT: Could you read the original question back, please, ma'am.
>
> (Previous Question read by the Court Reporter.)
>
> THE COURT: That was not the original question. You went through every single page and asked him to mark every single page that he was critical of. So we're now in the last page. So finish having him explain what is wrong with the rest of that page, Mr. Abbott. I won't have you stand up in argument and say he only criticized one, two and three and didn't criticize four and five because you cut him off. So please finish the last page, Mr. Schultz.

*Id.* at 203–05.

At no point did Abbott instruct Schultz to critique the entire document or state there were five points to address on the final page, despite the trial judge's statement. Instead, Abbott directed the questioning page-by-page until Schultz refused to answer questioning

directly. While standing over the jury box, the court permitted a three-page (and minutes-long) diatribe by Schultz, which Abbott thereafter moved to strike as nonresponsive. *Id.* at 208. The judge stated: "Oh, it was fully responsive. Overruled." *Id.*

The next day, Queen attempted to play the video deposition of MSNBC President Phil Griffin. *Id.* at 214, 216. The court asked if the defense intended to play portions of the deposition as well, which Hayes confirmed. *Id.* at 215. The judge asked if there was overlap in the two videos and whether counsels attempted to confer to avoid redundancy. *Id.* Hayes responded, but the judge did not allow Queen's counsel Abbott to counter. *Id.*

During Schultz's former counsel Jeffrey Landa's[9] testimony, Abbott asked if a partnership could be formed by an oral agreement. *Id.* at 217. The court interjected and supplied Hayes with an objection to Abbott's questioning:

> THE COURT: Mr. Abbott, are you using this witness as a fact witness or are you using this to provide the legal instructions that I will give to this jury at the end of the presentation of evidence?

---

[9] The Court granted Queen's motion to disqualify Landa as Schultz's trial counsel. *Id.* at 164.

MR. ABBOTT: No. I'm using this witness, Your Honor, as a representative of the defendant making an offer to form a partnership and asking him what his understanding is.
THE COURT: Is there an objection?
MR. HAYES: Yes, there is.
THE COURT: Sustained.

*Id.* Later, Abbott attempted to play a fifteen second video of Landa appearing on Schultz's radio show, but had not yet moved the clip into evidence. *Id.* at 220–21. The judge scolded him in the presence of the jury. *Id.* at 221 ("Well Mr. Abbott, how do you expect to just play something in front of the jury if it's not in evidence? You think I'm not going to notice?").

Two days later, Schultz presented Allan Horlick in the middle of Queen's case-in-chief, for witness availability purposes. *Id.* at 251. On cross, Queen's counsel Abbott asked four short questions regarding whether Horlick had received Queen's subpoena, which Horlick denied. Later, in a bench conference, Abbott attempted to show the trial judge he had served Horlick with a subpoena. *Id.* at 257. Hayes noted Queen's subpoena had been served at the wrong address. *Id.* Abbott apologized, but the court scolded him for "plant[ing] a seed here in front of the jury that this witness lied." *Id.* Abbott attempted to explain, but the trial judge stated: "You need to correct that. How do you plan to correct it

*unless you want me to correct it*?" *Id.* at 258 (emphasis added). The judge instructed the parties to confer and enter a written stipulation, which either Abbott or the judge would read to the jury. *Id.* The judge had Abbott read the statement to the jury immediately prior to questioning his own client:

> My apologies to the Court, the jurors, the defense and Mr. Horlick for asking him if he had been served with a subpoena by my office for trial. We did a LexisNexis Accurint search through their data base and the name we searched or the name we found was exactly the same Allan S. Horlick. The age was 73. He had a prior Washington D.C. address. That person called my office and told the paralegal who was at this trial that he would not honor our subpoena. I was mistaken and for that I apologize.

*Id.* at 266.

After defense witness Paul Woodhull testified, one of the juror's informed the court of his belief that Woodhull was his neighbor, has six children, their children play together, and described Woodhull's businesses. *Id.* at 262. The Court asked the juror two follow-up questions: (1) if he had ever spoken to Woodhull and (2) if he could be impartial. *Id.* at 262–63. Queen moved to excuse the witness. *Id.* at 263. The court responded: "All right, do have [sic] you have any response to Mr. Abbott's *motion to create an appellate issue*?" *Id.* at 264 (emphasis

added). The court denied the motion, despite the availability of alternate jurors. *Id.* at 265. That witness subsequently became the jury foreman.

At the close of Queen's case, Abbott offered the remaining emails that had not been individually entered as circumstantial evidence of fourteen months of partnership communications or under the state of mind exception. *Id.* at 269–87. The judge not only provided Hayes with his objection,[10] but also scolded Abbott.[11] Abbott attempted to move the remaining emails into evidence as a "composite of e-mails." *Id.* at 294-95. The judge corrected him in front of the jury. *Id.* at 297 ("It's not a composite of e-mails. What is it? How many e-mails are in this 1E? Or how many pages?"). The judge admitted the emails, but improperly instructed the jury, as addressed in Part I. Queen then rested his case.

---

[10] The following occurred:

> THE COURT: Okay, Mr. Hayes. . . . Your objection? And is it your objection because it's from Michael Anderson, Plaintiff and it's his out of the court statement and so it's hearsay because it's not being offered by a party opponent?
> MR. HAYES: Well, Your Honor, yes.

*Id.* at 274.

[11] "Mr. Abbott, I don't know how you try cases in Jacksonville, Florida but we are really far more buttoned up here in D.C. than the performance that I've seen. Document dumps like this, you know, you take your, you do this at your peril in front of the jury." *Id.* at 293.

### ii.    *Charging Conference*

In discussing the proposed jury instructions, Schultz's counsel Hayes argued spoliation was only discussed pretrial and no evidence of Schultz deleting his emails had been introduced at trial. *Id.* at 300. However, as noted by Queen's counsel Teppler, Schultz admitted on the stand he had deleted his emails. *Id.* at 301. When Queen's counsel Teppler made a suggestion regarding the wording of the spoliation instruction, the following occurred:

> THE COURT: Is that really what you're suggesting, Mr. Teppler?
> MR. TEPPLER: Yes, Your Honor. I think there's been sufficient—
> THE COURT: *Mr. Abbott, are you just trying to create appellate issues?* Is that what you're doing over there?
> MR. ABBOTT: No, ma'am.
> THE COURT: Well, I've got a different suspicion. It's not—*it makes me view your comments in a very different light in terms of how much weight I give to them at all.*

*Id.* at 303 (emphasis added).

The trial judge sustained Hayes's objection and removed the entire spoliation instruction. *Id.* at 330. The judge noted the reason the trial was taking place was because she addressed an implied partnership theory at summary judgment and blamed this Court for allowing Queen to try his case:

> I just think we're in this pickle right now in part because in my resolution of the summary judgment motion I addressed an implied partnership theory that the plaintiff threw up, like the other wet noodles, on a wall to see what would stick, and I addressed it . . . and so the Circuit proceeded to address it, and that put us all in this pickle. I'm not going to get us into another pickle for addressing things that are not pled, totally vague. I'm taking out everything about wrongful dissociation.

*Id.*

Teppler later requested a modification to "Formation of Partnership" portion of the jury instructions, explaining intent is not required to form a partnership under D.C. law, which the court denied, calling a plain reading of the statute a "bizarre" interpretation. *Id.* at 290, 298. Queen's counsel Teppler proposed the "disassociation" instruction explain if a partner is in a partnership for a particular purpose dissociates before that particular undertaking has been completed, it would be considered wrongful dissociation. *Id.* at 323. As addressed in Part III, the judge responded that would make the partnership "involuntary servitude," *id.* at 324, 329, an argument Schultz adopted in his closing, *id.* at 334–36.

During Queen's closing, Abbott referred to the fact that while Queen produced 1200 emails, Schultz erased his emails. *Id.* at 337.

Hayes objected and the judge instructed the jury that the emails were "admitted with a limiting instruction that they were admitted simply for the plaintiff's state of mind." *Id.* at 338. After Abbott finished, Schultz objected again to the statements regarding Schultz's deletion of emails, and requested an instruction it be disregarded. *Id.* at 339. Abbott attempted to explain that both Landa and Schultz testified Schultz did not produce any emails. *Id.* The trial judge incorrectly told Abbott he had not asked Schultz if he erased his emails. *Id.* The judge instructed the jury: "Ladies and gentlemen, you heard reference in Mr. Abbott's rebuttal summation about the erasure of emails to Mr. Schultz. You are to disregard that. There's no evidence in the record about that." *Id.* at 340.

In *United States v. Edmond*, the appellants sought review of their drug offense convictions asserting, among other things, judicial bias in the enforcement of procedural restrictions, comments to defense counsel, and nonverbal conduct. 52 F.3d 1080, 1099–103 (D.C. Cir. 1995). This Court found the challenged behavior largely consisted of procedural issues within the trial court's discretion in controlling the conduct of trial and did not reflect the trial court berating or belittling

defense counsel. *Id.* at 1101–02. This Court specifically distinguished the improper language used in *United States v. Spears*, 558 F.2d 1296 (7th Cir. 1977) (per curiam) ("You're not at 26th St. now, you're here, and you behave yourself . . . or I'll touch you where it hurts, and that will be in your pocketbook. . . . Who do you think you are?"). *Id.* at 1102. Ultimately, this Court held the trial court's behavior was necessary to maintain order in a complex trial and expressions of irritation or impatience were provoked and restrained. *Id.* at 1103.

Here, on the other hand, the trial judge's behavior went beyond controlling the trial conduct to advocating and assisting Schultz's counsel while scolding and belittling Queen's co-counsel. The trial court did not remain objective, but rather blamed this Court for requiring it to hold a trial on Queen's "absurd" claim. J.A. at 330, 401. As discussed above, the trial court:

- threatened Abbott and Teppler (Queen's co-counsel) with unwarranted Rule 11 sanctions, *id.* at 132–33;
- belittled Abbott as a Jacksonville, Florida attorney who does not understand the "highly educated, experienced, professional people [of] Washington, D.C.," *id.* at 167–68, 293;
- permitted Schultz to bolster his argument with the judicial imprimatur, *see supra* Part IV;
- empowered Schultz to refuse to answer Queen's questioning, reach into the jury box, and go on a tirade before the jury, *id.* at 201–08;
- provided Schultz with objections, *id.* at 217, 274;

- sustained Schultz's objections before they were made, *id.* at 195;
- scolded Abbott in the presence of the jury, *id.* at 221, 297;
- compelled Abbott to apologize to the jury, judge, and opposing counsel before questioning his own client, *id.* at 258, 266;
- refused to remove a juror despite his admission that he might know one of the witnesses and the availability of alternate jurors, *id.* at 262–63;
- provided erroneous instructions to the jury, *id.* at 298, 300, 318, 321, 340; *see supra* Part I;
- accused Queen's counsel of creating appellate issues and admitted she would give his arguments less weight, *id.* at 303; and
- encouraged improper argument be made before the jury, *id.* at 324, 329; *see supra* Part III.

Queen asserts the trial court's behavior throughout the entire record, from beginning to end, demonstrates a high degree of favoritism toward Schultz and antagonism towards Queen and his counsel.

In addition to the imbalance in treatment, the trial court's tone and nonverbal communication were likewise hostile toward Queen and his counsel. Queen moved this Court to allow the audio recordings of the trial to supplement the record in order to support this allegation, but the motion was denied. Nevertheless, Queen asserts the trial judge's bias was further conveyed through her facial expressions, gestures, and tone of voice, and this behavior, in addition to the errors addressed above, showed actual or apparent bias. Furthermore, the trial court's antagonism at every stage of the proceedings inescapably

chilled Queen's co-counsel's ability to advocate and substantially affected Queen's rights, such that it was more than an imperfect trial, but an unfair one as well.

This case is closely analogous to *United States v. Donato*, 99 F.3d 426 (D.C. Cir. 1996). In *Donato*, the appellant alleged the trial judge "made incorrect rulings on evidentiary issues, inappropriately interrupted her attorney, or made degrading remarks directed either at her or her attorney" such that it was impossible for her to receive a fair and impartial trial. *Id.* at 434. This Court noted the relatively brief two-week trial made the judge's negative comments all the more significant and would have "colored the entire trial," This Court stressed:

> Because this trial was shorter, the jury here was less likely to consider these comments to be discrete and aberrational. The comments were therefore more likely to affect the jury's ability to deliver a fair judgment.
>
> Not only were the judge's comments in this trial more concentrated . . . , they also appear to have been more frequent and critical. A review of the trial record reveals that the judge frequently berated, interrupted, and otherwise spoke negatively to the defendant's attorney. During what were arguably the two most crucial moments of the trial for the defendant, i.e., the cross-examination of [the plaintiff] and the direct examination of Donato herself, the trial judge addressed approximately 65 negative comments to the defendant's attorney, 55 of which were made in the hearing of the jury.

*Id.* at 435.

Here, trial consisted of only six days, making the numerous improper comments even more concentrated than *Donato*. Moreover, the trial judge also misbehaved during the most crucial moments of the trial by requiring Queen's counsel to apologize to the jury right before questioning his own client and emboldening Schultz during his lecture as he leaned into the jury box. The court's language highlighted above also resembles the tone and tenor presented in *Donato*. *See id.* at 435–37. Accordingly, as in *Donato*, the frequency, intensity, and one-sidedness of the court's hostility evidences sufficient bias to find Queen was unable to receive a fair trial. *Id.* at 437.

In *Donato*, this Court also found it relevant that the challenged errors indicated to the jury the trial judge mistrusted the defendant. *Id.* at 438. This Court instructed: "Trial judges should, to the greatest extent possible, avoid giving any hint as to whether they believe a particular witness is credible. This is especially true when the witness in question is [a party]." *Id.* at 438. Here, from the very start, the District Court permitted Schultz to reference its prior rulings in an attempt to paint Queen and his counsel as untrustworthy. As discussed

fully above, the District Court improperly permitted Schultz's use of the judicial imprimatur to give disproportionate weight in determining the credibility of Queen.

Accordingly, Queen submits the cumulative effect of these errors establishes judicial bias or, at the very least, an appearance of bias, in addition to the numerous unfavorable rulings, snide remarks, and scolding from pretrial through post-trial orders, providing a sufficient basis for reversal for a new trial before a new judge.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment and order denying Appellant's motion for new trial and recusal, and remand this action for further proceedings before a different judge.

Respectfully submitted,

ABBOTT LAW GROUP, P.A.

/s/ _Madison L. Kvamme_

MADISON L. KVAMME (FL. BAR NO: 104768)
STEVEN W. TEPPLER (DC BAR NO: 445259)
F. CATFISH ABBOTT* (FL. BAR NO: 265292)
2929 Plummer Cove Road
Jacksonville, FL 32223
T: 904-292-1111
steppler@abbottlawpa.com

FRAZER WALTON, JR. (DC BAR NO: 374301)
1913 D. Street N.E.
Washington, DC 20002
T: 202-398-8920
frawalton@verizon.net

*Co-Counsel for Appellant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify this initial brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 13,655 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii). I further certify this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because it has been has been prepared in Century Schoolbook 14-point font using Microsoft Word for Mac 2011.

/s/_____

MADISON L. KVAMME

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of electronic filing to all parties.


/s/_____
MADISON L. KVAMME